# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**REGINA RUSSELL,**
**on behalf of B. M.,**
**a minor child,**

      **Plaintiff,**

**vs.**                                      **Case No.  4:08cv392-RH/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and local rule 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, a minor child, by her mother, Regina Russell, applied for supplemental security income benefits.  Plaintiff was 11 years old at the time of the administrative hearing (on April 14, 2005).  It is alleged that Plaintiff is entitled to supplemental security income benefits due to a personality disorder and a thyroid disorder.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to

determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

A child's claim for supplemental security income benefits is analyzed by following the rules set forth in 20 C.F.R. § 416.924, et seq. The Commissioner "will consider the combined effects of all [the child's] impairments upon [the child's] overall health and functioning," and is to evaluate "any limitations in [the child's] functioning that result from . . . symptoms, including pain." 20 C.F.R. § 416.924(a). The claim is to be evaluated in three steps:

1.    Is the child currently engaged in substantial gainful activity?

2.    Does the child have any severe impairments?

3.    Does the child have any severe impairments that meet, are medically equal to, or functionally equal in severity to, an impairment listed in Appendix 1 of 20 C.F.R. Part 404?

20 C.F.R. §§ 416.924(a)-(d).

The claim is denied at step two if the child does not have a severe impairment. A "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations" is not a "severe impairment." 20 C.F.R. § 416.924(c).

At step three, the issue of whether the impairment meets or equals a listed impairment is the same as for evaluation of an adult claim. If the impairment neither

meets nor equals a listed impairment, the Commissioner must next determine whether the impairment is functionally equal in severity to a listed impairment. This step is unique to child supplemental security income disability claims. There is no "residual functional capacity" determination, and no determination of ability to perform work.

As to functional equivalency, the regulations provide:

> If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that functionally equal the listings. By "functionally equal the listings," we mean that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section.

20 C.F.R. § 416.926a(a) The domains are:

    (i)       Acquiring and using information;

    (ii)      Attending and completing tasks;

    (iii)     Interacting and relating with others;

    (iv)    Moving about and manipulating objects;

    (v)     Caring for yourself; and,

    (vi)    Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i) – (vi).

"[A] 'marked' limitation in a domain [will be found] when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). It "means a limitation that is 'more than moderate' but 'less than extreme.' " *Id.*

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is

two standard deviations or more below the mean, but less than three
standard deviations, on a comprehensive standardized test designed to
measure ability or functioning in that domain, and your day-to-day
functioning in domain-related activities is consistent with that score.

20 C.F.R. § 416.926a(e)(2)(iii).

"[A]n 'extreme' limitation in a domain [will be found] when your impairment(s)

interferes very seriously with your ability to independently initiate, sustain, or complete

activities."  20 C.F.R. § 416.926a(e)(3)(i).

If you are a child of any age (birth to the attainment of age 18), we will find
that you have an "extreme" limitation when you have a valid score that is
three standard deviations or more below the mean on a comprehensive
standardized test designed to measure ability or functioning in that
domain, and your day-to-day functioning in domain-related activities is
consistent with that score.

20 C.F.R. § 416.926a(e)(3)(iii).

The Commissioner's regulations provide that test scores are not to be relied upon

without considering other evidence, and "[n]o single piece of information taken in

isolation can establish whether you have a 'marked' or an 'extreme' limitation in a

domain."  20 C.F.R. § 416.926a(e)(4)(i).  Test scores are considered "together with the

other information we have about your functioning, including reports of classroom

performance and the observations of school personnel and others."  20 C.F.R. §

416.926a(e)(4)(ii).

To decide whether the claimant has a "marked" or an "extreme" limitation, the

Commissioner:

will consider your functional limitations resulting from all of your
impairments, including their interactive and cumulative effects.  We will
consider all the relevant information in your case record that helps us

determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§416.924a, 416.924b, and 416.929.

20 C.F.R. § 926a(e)(1)(i).

The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we will consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

20 C.F.R. § 926a(e)(1)(ii).

**Analysis**

Plaintiff contends that the Administrative Law Judge erroneously rejected the opinion of a her treating physician, finding that Plaintiff did not meet or equal a listed impairment, and also contends that the ALJ erred in finding her mother's testimony not credible. Doc. 16, p. 20. Plaintiff argues that the evidence compelled a conclusion that her condition meets Listing 112.02 (Organic Mental Disorders), Listing 112.08 (Personality Disorder), Listing 112.11 (Attention Deficit Hyperactivity Disorder), or that her impairments equal a Listed impairment. In particular, Plaintiff argues that the evidence shows that Plaintiff has difficulty with concentration, and must be frequently prompted to stay on task. Doc. 16, p. 27. Cited for this is R. 248, 250, 251, 295, 358, 363, 383, 387, 434, 435, and 437. *Id.* and pp. 25, 28. The evidence cited will be discussed ahead in context with all of the other evidence.

**Evidence**

On September 27, 2002, when Plaintiff as nearly 9 years old, Plaintiff had a consultative psychological examination by Marie P. Hume, Ph.D.  R. 195.  Her mother reported that Plaintiff had had three behavior referrals in the month since school had started, was messy, would not listen, but would "go along" with some of her peers.  *Id.*  While she had been diagnosed with a thyroid problem before birth, she had no auditory, visual, sensory, or motor problems and there were no early development problems.  *Id.*  Her mother said that her daughter's biggest problem was with "always saying that she wants to die."  *Id.*  Dr. Hume had no "collateral educational, medical, or psychiatric records" to review, and felt that such information would be essential.  *Id.*  Dr. Hume felt that Plaintiff's initial response was rehearsed, and that Plaintiff was "lazy" when she started testing.  *Id.*  When confronted with a test item that she did not want to do, Plaintiff put her head down and refused to respond.  *Id.*  At one point, she threw a pack of cards down.  *Id.*  When Dr. Hume shifted from the intellectual test to a visual-motor test, Plaintiff smiled, suddenly started trying, became more talkative, began smiling and laughing, and "turned from a grumpy little thing to a very pleasant, friendly little girl."  *Id.*  "Her mood was greatly improved."  *Id.*  Dr. Hume found her IQ scores to be invalid due to her negative attitude during that portion of the test.  *Id.*  She thought it likely that Plaintiff functions in the low average to average range.  *Id.*  She scored in the low average range for reading and math skills.  R. 198.  Her spelling skills were average.  *Id.*  Dr. Hume concluded:

>[Plaintiff's] performance suggests that her ability is at least Low
>Average, and certainly much higher than the IQ test scores (considered
>invalid) suggest.  There is no indication of a learning disability based on
>the results obtained.

R. 198.  Her diagnostic impression was disruptive behavior disorder.  R. 198.  The

prognosis was guarded, and it was thought that Plaintiff "would probably benefit

from counseling."  *Id.*

In late September and early October, 2002, Plaintiff's two teachers filled out a

pre-referral information form.  R. 135.  It was noted that Plaintiff seemed to be in her

"own world."  *Id.*  It was thought by both teachers that Plaintiff was slow to follow

directions, had difficulty in following directions in sequence, appeared to be

inattentive and was easily distracted, had low tolerance of frustration, had poor

judgment in social skills, was withdrawn, had a short attention span, and had

difficulty expressing ideas.  *Id.*

On November 2, 2002, Plaintiff missed 5 answers in her workbook, became

angry, slammed books and chairs around the room, and was written up for a

conference.  R. 207.

On January 10, 2003, at age 9, Plaintiff was seen at the Apalachee Center for

Human Services.  R. 421.  It was thought that her biological father had killed three

people in the period 1986 to 1990, and her father and mother had never married.  *Id.*

Her mother had attempted suicide.  *Id.*  Her father used drugs and alcohol, and her

mother used drugs prior to pregnancy and still drank alcohol.  *Id.*  Her mother was

not working.  *Id.*

On January 21, 2003, Plaintiff's "psychosocial history" was taken at Apalachee Center for Human Services.  R. 413.  It was reported that Plaintiff frequently fought with her peers, had poor grades, and threatened to kill her teacher and herself at times.  *Id*.  It was reported that she currently lived with her mother and sister in "an apartment in the projects," that her mother "is an alcoholic and her father drinks and does drugs."  *Id*.  She visited her father on weekends.  *Id*.

On February 11, 2003, the counselor met with Plaintiff in school.  R. 397.  Her teacher said that she almost always misses class on Mondays, and was often off task and easily frustrated.  *Id*.  Her attention span was short, and she was often behind in her work.  *Id*.  The counselor found that when Plaintiff was given only one direction at a time, she "did great.  She followed every direction exactly as requested."  *Id*.

On February 13, 2003, Plaintiff was examined by a psychiatrist at Apalachee Center for Human Services for a psychiatric evaluation.  R. 303.  She was accompanied by her mother.  *Id*.  Plaintiff admitted that she fought with other children.  *Id*.  It was noted that she had a history of leaving school without permission, was off task, had concentration difficulties, was unable to sit still, was easily frustrated, and had a short attention span.  *Id*.  When she was born, she was in the intensive care unit for two weeks with a thyroid problem and she was two weeks premature.  *Id*.  She was taking Synthroid for that ailment.  R. 394.  It was noted that several family members suffer from various mental health disorders.  *Id*.  Her attitude was cooperative, her affect was blunted, and her thought processes

were organized.  R. 395.  The psychiatrist judged Plaintiff's intellectual functioning to be average.  *Id*.  Her strengths were a supportive family and good health.  R. 396. The diagnosis was attention deficit disorder and the prognosis was guarded.  *Id*.

On February 20, 2003, a counselor in school (SBS in the notes, School Based Specialist) took Plaintiff out of class for counseling.  R. 391.  She gave Plaintiff directions one at a time, and Plaintiff did excellently, stayed on task, and followed every direction correctly.  *Id*.  The goal was to increase to two or three directions at a time.  *Id*.

On February 27, 2003, the counselor pulled Plaintiff from class.  R. 384.  After counseling, the counselor returned with Plaintiff to class.  *Id*.  She said that Plaintiff can do the work, but needs constant monitoring.  *Id*.  Anger was identified as Plaintiff's top treatment priority by a reviewer for the Apalachee Center for Human Services.  R. 385.  The counselor said that Plaintiff was really trying to work on the issues.  *Id*.

On February 28, 2003, Plaintiff did an excellent job of reading but had to be prompted to stay on task.  R. 383.  Plaintiff was pleased that she had improved her word score.  *Id*.  She next went to another class and worked hard on the practice FCAT.  *Id*.  She completed at least seven pages of work.  *Id*.

On March 5, 2003, Plaintiff was sent to the office because she had stopped working.  R. 382.  It was noted that she got easily frustrated, and had minimal self-motivation.  *Id*.  She was easily distracted and needed constant monitoring.  *Id*.

The next day, Plaintiff was in a small reading class and stayed on task with verbal prompts.  R. 381.  Her participation in class was excellent, and she liked the class because she was successful in it.  *Id*.

On March 11, 2003, it was noted that Plaintiff especially did not like to follow directions and was stubborn.  R. 378.  The counselor said:  "[Plaintiff] can do well when she chooses."  *Id*.

On March 17, 2003, the counselor came into the classroom and Plaintiff was rolling around on the floor.  R. 377.  She had just come back from reading class, and the counselor said that reading was the only class in which Plaintiff would do any work.  *Id*.  The counselor took her out of class to complete her work, and twice had to send her into time out.  *Id*.  Plaintiff was angry.  *Id*.

On March 19, 2003, Plaintiff underwent a consultative examination to determine her cognitive development and academic mastery.  R. 256.  Her third grade teacher said that she had "mood swings and a poor attitude at times, but that she can be sweet and very helpful as well."  *Id*.  Plaintiff quickly developed rapport with the examiner, and said she especially liked timed tests.  R. 257.  She enjoyed the one-on-one relationship with the examiner, and employed a systematic style of problem solving, "working quickly yet carefully on both verbal and nonverbal items."  *Id*.  She particularly liked to do the nonverbal activities that required manipulation of various materials.  *Id*.  She became frustrated with difficult tasks, but was cooperative and with a small amount of encouragement, completed difficult tasks.  *Id*.  "Her attention never lapsed and she consistently worked diligently until time

limits were reached." *Id.* The test results were considered to be valid. *Id.* On the Stanford-Binet IQ scale, Plaintiff was functioning in the 33rd percentile, in the average range. R. 258, 260. On the Woodcock-Johnson test for achievement, Plaintiff's broad reading skills were at grade 2.7, her broad mathematics skills were at grade 3.7, and her broad language skills were at grade 4.1. R. 259. These scores were "commensurate with or what would have been predicted" based on her IQ scores. R. 260. On the Woodcock-Johnson test for cognitive abilities, Plaintiff scored very low (1 percentile) in visual-auditory learning, and (9 percentile) in verbal comprehension and concept formation. R. 259. The former score was thought to indicate "difficulty quickly learning and retrieving information that has been taught recently." R. 262. Based upon a teacher's report, the examiner determined that Plaintiff fell within the depressed, withdrawn, anxious scale. R. 262. "Her behavior is elevated on the Anxious/Depressed, Social Problems, Rule Breaking Behavior and Aggressive Behavior scales." *Id.* Her teacher reported that Plaintiff

> prefers to be alone, is secretive, is shy, refuses to talk, lacks energy, is sad, and is withdrawn. She also reports that [Plaintiff] exhibits multiple symptoms of inattention, hyperactivity and impulsivity, including difficulty concentrating, difficulty following directions, and difficulty learning. Anecdotally, [her teacher] notes that [Plaintiff] can be sweet and very helpful.

R. 262-263. Another teacher said that Plaintiff can be very friendly. R. 263. Overall it was concluded that Plaintiff was functioning in the average range of overall intellectual ability and her achievement scores were either commensurate with, or exceed this estimate of cognitive functioning. R. 263.

On March 20, 2003, Plaintiff was observed participating satisfactorily in reading class in the morning.  R. 374.  That afternoon, she was required to write 100 sentences because she had not obeyed instructions.  *Id.*  She took longer than necessary to do that because she did not want to take her spelling test.  *Id.*  The counselor had Plaintiff return to class and take her test.  *Id.*  Plaintiff was very angry and "pitched a huge fit."  *Id.*  She threw her paper and pencil and "then she gave up like she was going to leave."  *Id.*  She was "sternly redirected," was mad, but sat down.  *Id.*  She took her spelling test and did well.  *Id.*

On April 2, 2003, the counselor again tried to redirect an angry Plaintiff.  R. 372.  Plaintiff was mad because "she didn't get her papers signed," presumably by her mother.  *Id.*  Although Plaintiff remained angry, she completed her assignment and made 100%.  *Id.*  It was noted that Plaintiff "continues to be very MOODY!"  *Id.*

On April 7, 2003, the counselor spoke to Plaintiff's mother about a "good size hole in a tooth."  R. 369.  Her mother said she had been to a dentist only once.  *Id.*  The counselor noted that she was taken to her thyroid treating physician only once every six months, and suggested that she have testing.  *Id.*  The counsel said that Plaintiff "is always tired, angry, very moody, lethargic, non-compliant and doesn't eat well."  *Id.*  She had missed four days of school the prior week.  *Id.*

On April 11, 2003, Plaintiff did very well in her reading class.  R. 368.  She became angry when another student was talking.  *Id.*  The counselor encouraged Plaintiff to ask the student to stop and she did.  *Id.*  She then was held back from "enrichment" to do makeup work.  *Id.*  She became very angry about having to write

two sentences.  *Id.*  After a brief time out, she "came back and did a super job of completing her work."  *Id.*  It was noted that she continued to often display such mood swings.  *Id.*

On April 15, 2003, the school counselor found that Plaintiff "did a good job staying on task, participating, following directions, and completing her work. . . .  She made very good grades and excellent marks for her behavior."  R. 367.  It was later noted that Plaintiff was:

> making progress but has a ways to go yet.  She is still having problems
> in class with sleeping and being manipulative.  [Plaintiff] is learning
> good listening skills and is easily redirected.

R. 366.

On April 21, 2003, Plaintiff was seen by the school counselor.  R. 363.  When the counselor entered the class, Plaintiff was on the floor, playing, moaning, and complaining, and she had scattered paper and pencils around her desk.  *Id.*  The counselor made her clean up.  *Id.*  The counselor tried to help Plaintiff with an assignment, noting that the maximum time she could focus was 30 seconds.  *Id.*  It took Plaintiff 30 minutes to write ten sentences.  *Id.*  Finally, it was noted that Plaintiff "had a very hard time focusing, staying on task, in her chair, and working quietly." *Id.*

On April 23, 2003, after seeing the school counselor, Plaintiff returned to her reading class and "did excellent," completing two assignments.  R. 361.

On April 24, 2003, Plaintiff was seen in school by her counselor.  R. 360.  She was angry because she could read faster than her peers, and was frustrated a lot.

*Id.* When she went to "enrichment," she "did participate and actually appeared to enjoy herself." *Id.* She went back to class with a much improved mood, participating in the next discussions and had her homework. *Id.*

On April 28, 2003, Plaintiff's school counselor took Plaintiff out of class because she had a substitute teacher that day, she was out of her seat, and angry. R. 359. Plaintiff quickly got over being angry. *Id.* Plaintiff said she does not see her mother much on weekends, and spent most of her weekends with her cousin. *Id.* She went back to class without being angry. *Id.* The counselor sat in class with her, and she worked on her assignment, displayed good participation, and completed her work. *Id.* However, when she went to her second reading class, she got angry again, complained the entire time, and had to be given one direction at a time "or she shuts down." *Id.* The counselor said that Plaintiff needed "constant monitoring to do any work and maintain good behavior," and she was "constantly moody." *Id.* Her mother had not followed through with requests that had been made to her. *Id.*

On April 29, 2003, Plaintiff was seen at the Apalachee Center for Human Services. R. 358. Her diagnosis was intermittent explosive disorder and major depression disorder single episode. *Id.* It was found that Plaintiff had "academic problems, fighting w/peers, off task, AWOL from school, difficulty concentrating." *Id.* Her in-school counselor reported that she was "easily frustrated and, in school, doesn't want to work. Behaviors are improving through active [behavior modification]." *Id.*

On April 30, 2003, Plaintiff's counselor told her that she had "shown a lot of progress over the last two weeks," was "much more cooperative, on task, trying hard, and doing her work." R. 357. It was noted that "since [Plaintiff] got a spanking at school, she's better." *Id.* She was only working 75% of the day and "shuts down in the afternoon during math." *Id.* This was thought to be "tremendous progress." *Id.* The counselor sat with Plaintiff during the reading class, and she did well. *Id.* She still got aggravated with peers who read more slowly than she did, but was handling the aggravation better. *Id.* She participated "without throwing a fit." *Id.* "She copied items off the overhead, wrote down notes, work with peers, and completed her assignment." *Id.*

In the spring of 2003, Plaintiff took the third grade FCAT. R. 140. She scored in the 36th percentile in reading comprehension and in the 32nd percentile in mathematics problem solving. *Id.*

On May 2, 2003, the school counselor reported that Plaintiff did well in reading, completing her work and following most directions without arguing. R. 356. Back in regular class, she had difficulty, but told herself to try and tried very hard, though she did not complete her work before the time expired. *Id.* It was noted that her focus was better that day. *Id.*

On May 5, 2003, Plaintiff came late to school because she had spent the night with her Godmother rather than at home with her mother. R. 355. It was noted that when she was not home with her mother on a school night and comes to school late, she is very moody and does not want to do any work. *Id.* In class, she

moaned, complained, roamed the room, talked to her peers, and argued about every direction given to her. *Id.* She was having a hard time adjusting to being in regular class three quarters of the day. *Id.*

On May 6, 2003, Plaintiff was again late to school, having again stayed over night again with her Godmother, and she had a bad attitude. R. 354. She was moody and lethargic. *Id.* She did complete her reading assignment. *Id.* When she went to her regular class, she sat down and worked very hard, participating in discussions and writing in cursive. *Id.* This was deemed by the counselor to be "tremendous progress." *Id.* It was noted that Plaintiff's mother had not followed through with Plaintiff's EKG and blood work. *Id.*

On May 12, 2003, Plaintiff was participating in language class, and though the work was very difficult for her, she tried and asked for help appropriately. R. 353. She was making progress in regular class, and her self-confidence had increased. *Id.* She was working on four subjects, and her mood swings were decreased. *Id.*

On May 16, 2003, Plaintiff had been out of school for two days, making it hard for her to get back on track. R. 352. She complained that the work was too hard. *Id.* She was pulled from class, counseled, and returned and did better. *Id.* She took a test, complaining, but "made a 100% on her test." *Id.* She had gone to the doctor and had had her blood drawn. *Id.* She went back to regular class, struggled with her next assignment, but tried. *Id.* It was thought that she was making progress. *Id.* The school counselor thought that Plaintiff would not pass her grade level that school year because she was so far behind. R. 351.

On May 20, 2003, Plaintiff stayed focused in class for at least 25 minutes. R. 350. She was very polite when speaking to the counselor and her fellow students. *Id.* She did a good job during oral discussions. *Id.*

On May 22, 2003, the last day of school, it was noted that Plaintiff was scheduled to go to summer school. R. 349. She told the counselor that she was angry but did not know why. *Id.* The counselor thought that she handled her anger very well and followed directions to complete her work, although she was very restless and "fidgety." *Id.* It was then determined that Plaintiff would not go to summer school and that she would have to repeat third grade. *Id.* It was noted that Plaintiff had not done any math work that year. *Id.* By the end of her third grade year, Plaintiff had received the following overall grades: two D's and four C's in First Grade; one D, one C, and three B's in Second Grade; and two F's, two D's, and 1 C in her first year in Third Grade. R. 147-150.

On June 10, 2003, a state agency psychologist and physician determined from the records that Plaintiff's diagnoses were oppositional defiant disorder and hypothyroidism (controlled). R. 229. They both determined that Plaintiff's impairments did not meet or equal a Listed impairment. *Id.* They found Plaintiff's impairments in acquiring and using information, and attending and completing tasks, to be less than marked. R. 233. They reasoned that Plaintiff was not motivated for academic work, and that Plaintiff has the ability to maintain attention for tasks she likes, but is not motivated to do so. *Id.* They found that Plaintiff was markedly limited in the domain of interacting and relating with others, finding that Plaintiff

"continues to demonstrate a pattern of oppositional behaviors in spite of treatment and intervention attempts." *Id.*

Plaintiff returned to school on August 8, 2003, in third grade again. R. 343. Plaintiff was very neat and clean. *Id.* She had spent the summer with her father. *Id.* She listened appropriately to oral instructions, and followed most of them. *Id.* Her work was very neat, but she needed to be prompted to work quietly. *Id.* She stayed "on task" 80% of the time that day. *Id.*

On August 14, 2003, Plaintiff was observed again by the school counselor. R. 341. She did well all day, and was proud of her accomplishments. *Id.* Math was very hard for her, but she did not get frustrated. *Id.*

On August 18, 2003, Plaintiff had an episode of anger and was counseled. R. 340. Plaintiff "got herself together" with a better attitude. *Id.*

On August 25, 2003, her teacher said she had done very well maintaining good behavior despite the disruptive behaviors of classmates. R. 338. She was then angered by another classmate and threw a crayon. *Id.* Later in the day, during science, her attitude and behavior were much better, and her desk was neat and organized. *Id.*

On August 27, 2003, Plaintiff was told not to work on science because she did not have to do the work, and she got angry. R. 336. She then got "her behavior together and herself back on track." *Id.* She did very well in math. *Id.* She became angry again during the language class, and it was noted that she was not in the habit of working all day. *Id.*

By August 29, 2003, Plaintiff had completed her work all week, stayed on task, did her homework, and kept up with her assignment sheet. R. 335. It was noted that she had improved in these skills since the prior year. *Id*.

On September 5, 2003, Plaintiff was still on task, focusing on her work. R. 334. She was also doing excellently academically. *Id*.

Plaintiff was still doing well on September 10, 2003. R. 333. She was helping a "peer" write down his homework. *Id*. She was making a lot of progress and was pleased at her own progress. *Id*.

On September 12, 2003, Plaintiff was still doing well academically and with her behavior. R. 332. This showed "tremendous progress" from the prior year. *Id*.

On September 17, 2003, Plaintiff's teacher said that she continued to do very well, and was "a joy to have in class." R. 331. "[Plaintiff] is often chosen to help others because she is so responsible." *Id*.

On September 29, 2003, the school counselor observed Plaintiff in class without Plaintiff knowing. R. 329. Plaintiff was following along with the teacher, remained seated until her work was complete, and was not disruptive. *Id*.

On October 8, 2003, Plaintiff did very well in math, following directions, participating in oral discussions, and engaging in no disruptive behaviors. R. 327. She had some work that was not yet completed, and the counselor directed her to complete those, which she did. *Id*.

On October 16, 2003, Plaintiff reported that "everything is good at home." R. 326. Her mother was drinking more sodas than beer, and was "still doing good." *Id*.

Case No. 4:08cv392-RH/WCS

She was still not seeing her father, and the counselor commented that "this seems to be much better." *Id.* Plaintiff was consistently at school on time and not missing school. *Id.* It was noted that Plaintiff still tends to get out of her seat "at any given free time." *Id.* Plaintiff continued to struggle with language, but completed her assignment on time and was doing all of her home work. *Id.*

On October 21, 2003, Plaintiff's father came to school with the intent of removing her from school. R. 325. The counselor implored him not to do that since Plaintiff's behavior and progress was so much better than the year before. *Id.* It was noted that since her father had been "out of" Plaintiff's life, she had "done a complete turnaround." *Id.* It was noted that because the father did not have a car, Plaintiff almost always missed one or two days of school a week the prior year, causing tremendous problems. *Id.* Plaintiff had spent the last two nights with her father, and came to school angry, not knowing why, and was poorly dressed. *Id.* Plaintiff was very grumpy and angry that day. *Id.*

On October 30, 2003, Plaintiff's attitude was "horrible." R. 324. She argued with her teacher about her math test. *Id.* She was pulled from class and remained angry with her counselor for 45 minutes. *Id.* The counselor said that Plaintiff had not been back on track since she had seen her father, and she had been very difficult to handle. *Id.*

On November 4, 2003, Plaintiff's attitude was much better. R. 323. She was seated at work when the counselor entered her classroom. *Id.* She participated in discussions in class and was not disruptive. *Id.* She stayed on task for 30 minutes,

even though other classmates were throwing paper. *Id.* The counselor felt that she was back on track. *Id.*

On November 10, 2003, Plaintiff was in a very happy mood. R. 321. Her teacher said that she usually stays on task and completes her work. *Id.* She was still on task, with a good attitude, on November 18, 2003. R. 320. She was even able to not "shut down" when the class joined two other classes, though in the past, too much stimuli had caused her to "shut down." *Id.* She followed along and participated in the oral discussion. *Id.* She remained focused and behaved well in the next class. *Id.*

On December 8, 2003, Plaintiff had missed school the day before. R. 318. She had been at her father's house and his car broke down. *Id.* She was angry when she talked about this. *Id.* The counselor tried to talk to her about the importance of coming to school every day and Plaintiff became more angry.[1] *Id.*

On December 9, 2003, Plaintiff attended a special program with a motivational speaker. R. 316. Although she had, in the past, shut down when confronted with something new like this, that day she participated in the oral discussion and stayed focused for at least 30 minutes. *Id.* She did very well on the test which followed, with a score of 100%. *Id.* and R. 315.

A progress note on December 10, 2003, reported that Plaintiff's problems only occurred when she spent time with her father. R. 314. Her mother said that she

---

[1] It is unknown why the counselor thought that a 10 year old had the ability to get herself to school when her father was so unreliable.

was pleased with Plaintiff's progress at home.  *Id.*  She said that there were no major problems at home.  R. 313.

On December 17, 2003, Plaintiff became very angry during her reading class because she did not understand her assignment.  R. 311.  "With a little explaining [Plaintiff] stopped crying and appeared to understand the problem."  *Id.*  She was taking her medications as planned.  *Id.*  Plaintiff's desk was very neat.  *Id.*  She then participated in a math discussion with confidence.  *Id.*  She completed a math worksheet, staying seated and maintained her focus and persistence.  *Id.*  Her overall behavior was excellent in the next class.  *Id.*

On January 7, 2004, it was noted that Plaintiff's behavior was again disruptive and oppositional, and that she had been non-compliant, angry, lethargic, and grumpy since the Christmas break.  R. 310.  She was still taking her medications as planned.  *Id.*  She was angry about her reading class, and felt that the work was too hard.  *Id.*

On January 14, 2004, Plaintiff's teacher told the counselor that Plaintiff's behavior had gotten much worse.  R. 306.  She had hit a classmate three times without reason.  *Id.*  Plaintiff said that "everything was OK" at home.  *Id.*  After talking with the counselor, Plaintiff said: "when you do good in class the kids pick on you and make fun of you.  It is better not to be a smart kid."  *Id.*  Plaintiff agreed to get back on track because it felt better than being in trouble.  *Id.*

On January 16, 2004, Plaintiff was observed without her knowledge by her counselor.  R. 305.  Plaintiff remained focused for 30 minutes taking a test.  *Id.*

Then "out of nowhere," Plaintiff exclaimed that she was not doing any more work. *Id*. When the counselor talked to her, she admitted that she did not understand the work. *Id*. She then completed the test. *Id*. Her teacher said she was doing a little better, but still was not back on track. *Id*. Her mother was having no problems at home at the time. *Id*. Plaintiff was seeing her father at the time a lot. *Id*.

On January 23, 2004, Plaintiff was observed in class "being very difficult to get along with." R. 303. She was arguing with her teacher and did not want to follow directions. *Id*. Her teacher said that Plaintiff's behavior and attitude were still very bad, and she spent a lot of the day trying to pick fights with her classmates. *Id*. She was still seeing her father. *Id*.

On January 28, 2004, Plaintiff's bad behavior was continuing. R. 302. She blamed her classmates, and said that she was tired of them running all over her. *Id*. She had stopped taking her medications about a month earlier. *Id*.

On February 2, 2004, Plaintiff was observed in the class room. R. 301. She had difficulty staying seated, but completed her assignment within the time limit. *Id*. She stood, but did not wander. *Id*. Her interaction with classmates was good. *Id*. She hugged the counselor and said she was having a good day. *Id*. It was noted that this good attitude was like Plaintiff had been at the beginning of the year, and she was praised for getting back on track. *Id*.

On February 4, 2004, Plaintiff was doing much better. R. 300. She was focused during a motivational speech about achievement on the FCAT. *Id*. She participated in oral discussions. *Id*. She took a test afterward and did very well. *Id*.

On February 6, 2004, Plaintiff's attitude was not good.  R. 299.  Plaintiff admitted to the counselor, after being pulled from class, that she had not been very good that day.  *Id.*  She said she did not understand her work.  *Id.*  It was noted that Plaintiff easily becomes overwhelmed with a large reading assignment.  *Id.*  The assignment was four pages with 75 questions.  *Id.*  Plaintiff stayed focused for 45 minutes and was praised for her focus.  *Id.*

On February 20, 2004, Plaintiff's teacher said she was doing somewhat better that day, but had been horrible the day before.  R. 298.  Plaintiff had not gone to her father's home for the weekend, but had talked with him by telephone.  *Id.*  The counselor tried to talk with her, and she completed her work, but was still mad.  *Id.*

On February 19, 2004, Plaintiff's teacher told her counselor that Plaintiff still had good days and bad days.  R. 297.  She was disrespectful to her teacher the day before.  *Id.*  Her mother reported she was having some problems with Plaintiff at home.  *Id.*  Her mother thought that Plaintiff was upset because her father had "a new baby sister."  *Id.*  The counselor thought that Plaintiff should "go back on meds," but her mother disagreed.  *Id.*  The counselor talked with Plaintiff, and Plaintiff said that everything was good at home.  *Id.*  She admitted she had been disrespectful. *Id.*

On February 22, 2005, a treatment plan was prepared for Plaintiff at the Apalachee Center for Human Services.  R. 251.  It was determined there that Plaintiff had a "psychiatric disability as evidence by an inability to remain seated, lack of focus, and not following directions."  R. 251.  It was noted that she had poor

listening skills, failed to follow directions, had to be told multiple times before complying, and was easily distracted. R. 252.

On February 25, 2004, Plaintiff was counseled at her school. R. 295. The counselor noted that during the interview, Plaintiff's focus and participation was minimal. *Id.* She appeared to "have no interest in helping herself." *Id.* After counseling, Plaintiff returned to class. *Id.* "[D]uring the next two assignments she was focused and quiet," and the counselor "reinforced her improved behaviors." *Id.* The counselor said: "the only thing that holds [Plaintiff] back is her attitude." *Id.*

On February 26, 2004, Plaintiff's attitude remained bad. R. 294. She was observed in the classroom looking around and not paying attention. *Id.* She complained when the teacher gave her direction. *Id.* The counselor intervened, and Plaintiff said she did not want to do any work today. *Id.* The counselor stayed with her during the day, and found her to be "very difficult to handle right now." *Id.* The FCAT was pending, and a motivational speaking had talked to the students about trying to do well. *Id.* Plaintiff thought it was "stupid." *Id.*

On March 1, 2004, Plaintiff took part of her FCAT. R. 293. Her teacher said that she focused well during the test and was not getting frustrated. *Id.* Later during counseling, the counselor noted that Plaintiff "still pushes every limit possible." *Id.* On the same date, it was noted that Plaintiff had had problems after the Christmas break because she spent time with her father. R. 202. It was noted that her mother was alcohol dependent. *Id.* It was further noted that Plaintiff was highly manipulative, but had shown "great improvement overall." *Id.*

Plaintiff scored in the 49th percentile in reading comprehension on the FCAT. R. 138. She scored in the 39th percentile on mathematics problem solving. *Id.*

On March 3, 2004, Plaintiff threatened to "beat the blood" out of a classmate and kill her. R. 289. The classmate told the counselor that she was "aggravating" Plaintiff by staring at her. *Id.* Plaintiff said that the classmate had called her stupid and told her to shut up. *Id.* The teacher determined that Plaintiff was causing the trouble. *Id.* Plaintiff was sent by the teacher to see the Dean. *Id.* She was cooperative with the Dean, but not with the counselor, who noted that she tries to hold her accountable. *Id.* The counselor said that Plaintiff was angry with every female in her life. *Id.* Again, the counselor said that Plaintiff was very difficult to handle right now. *Id.*

On March 5, 2004, Plaintiff's mother told the counselor that Plaintiff was having problems with her father, that he would promise to visit and does not show up. R. 288. Plaintiff's mother also alleged that Plaintiff's father had killed three people and she felt that Plaintiff "is feeding off this." *Id.* Plaintiff was observed to become angry and non-compliant on questions relating to divorce, parents, and peers. *Id.*

On March 8, 2004, Plaintiff's teacher told her counselor that she could not believe the negative change in Plaintiff from the beginning of the year. R. 287. She said that on some mornings, Plaintiff comes into the class and tells her classmates she is not going to work that day, and they join her. *Id.* Her teacher said that Plaintiff did not get along with her classmates and showed no interest in doing her

work.  *Id.*  The teacher and the counselor discussed Plaintiff's problems with her

father.  *Id.*  The counselor felt that Plaintiff's problems were "directly related to her

father."  *Id.*  The counselor "saw no change [in her behavior] on meds."  *Id.*  On the

same day, Plaintiff told another counselor that she felt like her father "was not

interested in her anymore."  R. 286.  On the same date, Plaintiff was seen at the

Apalachee Center for Human Services, admitting that she heard her mother's voice

and claimed that the "devil" was in her.  R. 285.  It was noted that her uncle was

diagnosed with schizophrenia.  *Id.*

On March 11, 2004, the counselor noted that Plaintiff was very neat and

clean.  R. 284.  She was sitting upright in her seat.  *Id.*  Plaintiff willingly accepted

help with her math assignment, and her work was very neat.  *Id.*  When the

counselor asked Plaintiff "why the change," she said her Doctor had told her to

"straighten up."  *Id.*  Her classmates reported she had been nice to them all day.  *Id.*

The counselor said that Plaintiff "was wonderful to work with today."  *Id.*

On March 17, 2004, Plaintiff's mood was happy.  R. 283.  The counselor said

that Plaintiff "clearly understands what behavior is expected of her."  *Id.*  When she

went back to class, she was compliant and focused on her work.  *Id.*  The counselor

said she had been "much better" in school.  *Id.*

On April 15, 2004, Plaintiff's teacher said that her behavior was "a little

better."  R. 280.  She was no longer disrupting the whole class, and she had

received A's and B's on her report card.  *Id.*  The counselor said that Plaintiff was

"very aware of the behaviors that need to be changed."  *Id.*

On April 23, 2004, it was reported that Plaintiff had a better week.  R. 277.

She had behaved better with her classmates.  *Id.*  She was given a test of her

abilities to follow directions, and did very well.  *Id.*

On May 3, 2004, Plaintiff was still doing well, focusing on school work and not

misbehaving.  R. 276.  She had not seen her father in awhile, but talked with him on

the telephone.  *Id.*  She was sometimes frustrated with her work in class, but did not

argue, accepted help, and completed her assignment.  *Id.*  It was noted that she "did

a super job of participating" in the physical education class, and "was the best in her

class."  *Id.*  Her coach said that she had a lot of natural athletic ability.  *Id.*

On May 10, 2004, it was determined that Plaintiff had passed third grade.  R.

275.  Her mother said she planned to limit Plaintiff's contact with her father over the

summer.  *Id.*  On May 24, 2004, the last day of school, the counselor said that

Plaintiff was proud of her progress that year.  R. 274.  At the end of third grade in

2003-2004, Plaintiff made three B's and two A's.  R. 146.

Plaintiff went to 4H camp that summer.  R. 271-272.  She made several

friends, was respectful towards the guest speakers, and participated "somewhat" in

the group.  R. 272.  Swimming was her favorite part of camp.  *Id.*  The camp nurse

saw that she took her medication.  *Id.*  On August 2, 2004, it was noted that she

continued to take her medications properly and had had a good summer.  R. 267.

There do not seem to be any counseling notes for Plaintiff's fourth grade year.

On March 17, 2005, Abol Sadat-Mansouri, M.D., Plaintiff's treating psychiatrist,

completed a medical questionnaire.  R. 247-250.  Dr. Mansouri reported that

Plaintiff's symptoms included, *inter alia*, "poor attention, lack of focus." R. 248. He

found that she had "poor concentration and poor grades." R. 250. He said that her

"lack of attention and focus keeps her behind in school." *Id.* He said that she had

"poor listening skills." R. 248. He thought that Plaintiff met Listing 112.02 (Organic

Mental Disorders), but did not write anything in the space for his medical basis for

the conclusion. R. 247.

In the spring of 2005, Plaintiff scored 4 on the FCAT writing test. R. 137.

On August 17, 2005, Plaintiff was examined on a consultative basis by Carol

E. Oseroff, Ph.D. R. 427. The purposes was to measure Plaintiff's functional

limitations. *Id.* She was then age 11, 10 months, and a fifth grade student. *Id.*

Plaintiff was then taking Wellbutrin for depression, another medication for attention

deficit hyperactivity disorder, and Synthroid for hypothyroidism. *Id.* Plaintiff lived

with her mother, a stepfather, and a four year old sister. *Id.* She had some contact

with her biological father. *Id.* It was reported that she had been a disciplinary

problem at school, was easily frustrated, and did not pay attention. *Id.* She was

receiving psychiatric support through Apalachee Mental Health. *Id.* She was born

with a thyroid goiter. *Id.*

Dr. Oseroff reported that when Plaintiff was sent to live with an aunt in

Gainesville for preschool because her mother and father "were having relationship

issues." R. 428. She returned to Jefferson Elementary School for kindergarten, was

sent back to Gainesville for first grade, and attended Jefferson Elementary School

second through fifth grades. *Id.* Her behavior problems emerged in third grade. *Id.*

In fourth grade, she made A, B, and C grades.  *Id.*  Her mother said that she passed

the Florida Comprehensive Assessment Test (FCAT) every year but her first year in

third grade.[2]  *Id.*  It was reported that Plaintiff had a lot of friends in her neighborhood

and at school.  *Id.*  She had threatened another girl at school with a knife the year

before.  *Id.*

During the examination, Plaintiff's mood was cooperative but sullen and eye

contact was poor.  R. 429.  The intelligibility of her speech was excellent, the tone

and content normal for her age, but she spoke very little.  *Id.*  Her level of alertness

was good.  *Id.*

Plaintiff's mother was asked to complete a Behavior Assessment System for

Children . . . Parent Report.  R. 430.  As to this report, Dr. Oseroff found:

> A review of the validity indicators built into the instrument suggests that
> excessively negative responding occurred.[3]  Therefore, the report
> must be interpreted with extreme caution and only in light of other
> supporting documentation, and is therefore deemed invalid.

R. 430.  The reported results, therefore, were invalid in Dr. Oseroff's opinion.  R.

429.

Dr. Oserhoff's diagnosis was intermittent explosive disorder, by history, major

depressive disorder, single episode, by history, and hypothyroidism.  R. 430.  Since

the testing results were invalid, Dr. Oseroff recommended that another mental status

---

[2] The FCAT is only given from 3rd to 11th grade.  Third grade students must
obtain a passing score to go on to grade 4.  See http://fcat.fldoe.org/.

[3] In other words, Plaintiff's mother exaggerated the extent of Plaintiff's problems.

examination be conducted after receipt of updated psychiatric records and information about Plaintiff's functioning in the classroom from her teacher. *Id.* Dr. Oseroff determined that Plaintiff had no limitation in acquiring and using information, self care, and health, less than marked limitation in attending and completing tasks, and marked limitation in interacting and relating to others. R. 431.

On August 23, 2005, it was noted in a "client service plan" that Plaintiff was easily distracted by extraneous stimuli lasting for 5 minutes or more per episode. R. 437. Her diagnoses were major depression (mild) with mild and intermittent explosive disorder. *Id.* and R. 434. This was said to be evidenced by her impulsive behavior, and her inability to remain focused and follow directions. R. 436.

On February 22, 2006, a "client service plan" was prepared at Apalachee Center. R. 449. Plaintiff was again diagnosed with major depression, mild, and intermittent explosive disorder. *Id.* and R. 450. She was said to be impulsive, unable to remain focused, and could not follow directions, the same language used in the August 23, 2005, plan. *Id.*

On May 1, 2006, the school prepared an individualized education plan for Plaintiff. R. 460. Her current grade was 5th grade. *Id.* She was placed in the regular class. R. 461. Her accommodations included extended time on assignments and tests. *Id.* Her "primary exceptionality" was said to be "emotionally handicapped." R. 460.

**Legal analysis**

As noted earlier, Plaintiff contends that the ALJ should have found her impairments met Listing 112.02 (Organic Mental Disorders), Listing 112.08 (Personality Disorder), Listing 112.11 (Attention Deficit Hyperactivity Disorder), or that her impairments equal a Listed impairment. She also contends that the ALJ did not give sufficient weight to the opinion of her treating physician and the testimony of her mother.

The claimant has the burden of proving that her impairments meet or equal a listed impairment by presentation of specific evidence of medical signs, symptoms, or laboratory test results meeting all of the specified medical criteria. Sullivan v. Zebley, 493 U.S. at 530, 110 S.Ct. at 891. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* (emphasis by the Court).

**Listing 112.02** provides:

**112.02 Organic Mental Disorders**: Abnormalities in perception, cognition, affect, or behavior associated with *dysfunction of the brain*. The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.

(Emphasis added.)  "Organic" means pertaining to an organ or organs.[4]  The ALJ

determined that Plaintiff did not meet Listing 112.02 (Organic Mental Disorders).  R.

24.  He reasoned:

> There is nothing to suggest that the claimant has any organic mental problems.  There was no head trauma, no lesions or birth defects.  She has no substance-related problems, no cancer, no signs of brain disease and nothing to suggest any chemically induced organic problems.

R. 24.

This conclusion is supported by substantial evidence in the record.  Plaintiff

has pointed to nothing in the record to prove that her behavioral problems are due to

brain damage or damage to any other organ of her body causing dysfunction of the

brain.

**Listing 112.08** provides:

> **112.08 Personality Disorders**:  Manifested by pervasive, inflexible, and *maladaptive personality traits*, which are typical of the child's long-term functioning and not limited to discrete episodes of illness.
>
> The required level of severity for these disorders is met when the requirements in *both A and B are satisfied*.
>
> > A.  Deeply ingrained, maladaptive patterns of behavior, associated with one of the following:
> >
> > > 1. Seclusiveness or autistic thinking; or
> > >
> > > 2. *Pathologically inappropriate* suspiciousness or *hostility*; or

---

[4] DORLAND'S MEDICAL DICTIONARY FOR HEALTH CONSUMERS, available at: http://www.mercksource.com (Medical Dictionary link).

3. Oddities of thought, perception, speech, and behavior; or

4. Persistent disturbances of mood or affect; or

5. *Pathological* dependence, passivity, or *aggressiveness*; or

6. Intense and unstable interpersonal relationships and *impulsive and exploitative behavior*; or

7. Pathological perfectionism and inflexibility;

and

B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), *resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.*

(Emphasis added.) The criteria of Listing 112.02B.2. are:

2. For children (age 3 to attainment of age 18), resulting in at least two of the following:

a. Marked impairment in age-appropriate cognitive/ communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if

necessary, the results of appropriate standardized tests; or

c.  Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d.  Marked difficulties in maintaining concentration, persistence, or pace.

In addition to the definitions of "marked" described above, Listing 112.00 defines

"marked" as:

Where "marked" is used as a standard for measuring the degree of limitation it means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis. . . .

**Listing 112.11** (Attention Deficit Hyperactivity Disorder) provides:

112.11 Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied.

A. Medically documented findings of all three of the following:

1. Marked inattention; and

2. Marked impulsiveness; and

3. Marked hyperactivity;

Case No. 4:08cv392-RH/WCS

and

> B. For older infants and toddlers (age 1 to attainment of
> age 3), resulting in at least one of the appropriate
> age-group criteria in paragraph B1 of 112.02; or, for
> children (age 3 to attainment of age 18), resulting in at
> least two of the appropriate age-group criteria in
> paragraph B2 of 112.02.

Listing 112.11.  Thus, Listings 112.08 and 112.11 required two or more of the criteria

of B2 of Listing 112.02.

The ALJ determined that the requirements of Listing 112.11 were not met.  R.

22.  He reasoned:

> The diagnosis of ADHD is based in part on the child showing
> hyperactivity and inattentiveness but not at a marked level.  She is not
> impulsive as her testimony indicated, and the records from school show
> her to engage in activities that are well thought out and considered.
> She does well in her testing as per the testimony, and she did not fail
> any subjects last year.  Clearly, she has a behavior problem but it is not
> of listing level severity as per the above.

*Id.*

While the school record shows a number of instances of inattention,

impulsiveness, and hyperactivity, the conclusion that Plaintiff was not "markedly"

limited in these ways is supported by substantial evidence in the record.  Plaintiff

was able to focus her attention on many occasions.  She controlled her

impulsiveness on many occasions.  She controlled her tendency to be

inappropriately active on many occasions.  She got good grades on the FCAT and in

her school work.  Accordingly, the ALJ's decision that Plaintiff's condition does not

meet Listing 112.11 is supported by substantial evidence.

The ALJ reasoned that Plaintiff's "ODD" (Oppositional Defiant Disorder) "is best evaluated under the Medical Listing 112.08 entitled Personality Disorders." R. 22. He said:

> The record seems to indicate that there are pervasive, maladaptive personality traits which appear typical of the child's long-term functioning, and I do see evidence of maladaptive patterns associated with some aggressiveness. However, I do not find the aggressiveness to be "pathological" as required by the listing. There is clear evidence that the child has some ability to control her outbursts. She has only been suspended twice this year, and, though she squabbles a lot with her teachers and mother, she has friends and can act appropriately when she so chooses. I do see some serious problems interacting with people, but I do not see that such problems interfere with her activities of daily living. The cited listing would also require at least two of the appropriate age-group criteria in paragraph B2 of 112.02 be established. Indeed, but for some social functioning limitations, there is little to support any other problems related to ODD.

R. 22.

Later, when considering whether Plaintiff's impairments were functionally equivalent to a Listed impairment, the ALJ acknowledge that the evidence showed that Plaintiff had serious problems with aggressiveness towards others:

> The domain involved with the child's ability to interact with others is the area of most concern in this case and *I am satisfied that she has a marked limitation in this domain.* In so finding, I note that she has threatened a teacher with death and has been suspended for fighting twice this school year. I believe that she fights with her sister as per the testimony, and I have considered the fact that both consultative examiner's [sic] found her to be sullen and uncooperative. I also note however that she is reported to have some friends, supposedly has a good relationship with her stepfather and is described by her current teacher as a good child to have in class. She seems able to point to some provocation for her outbursts, but she has never actually injured someone seriously when she was upset. I find that she has marked but not extreme limitation in the domain of interacting with others.

Case No. 4:08cv392-RH/WCS

R. 27-28 (emphasis added).

Thus, it is unclear whether the ALJ's determination that Plaintiff's aggressiveness and hostility towards others is not "pathological" can be squared with his determination that Plaintiff is markedly limited in "interacting and relating with others." The determinations, of course, are related to different criteria. The first, concerning whether Plaintiff's aggressiveness is "pathological," relates to Listing 112.08A.2. and 5., while the second, concerning Plaintiff's ability to interact with others, addresses the "domain" described in 20 C.F.R. § 416.926a(b)(1)(iii) for functional equivalence to a Listed impairment. But both directly consider the degree to which Plaintiff is limited by her hostility and aggressiveness towards others.

The court need not decide this issue, however, because to satisfy Listing 112.08, Plaintiff must also show a second 112.02B criterion. There are three left to consider: whether Plaintiff has "marked impairment in age-appropriate cognitive/ communicative function," "marked impairment in age-appropriate personal functioning," or "marked difficulties in maintaining concentration, persistence, or pace." Plaintiff does not argue that the evidence shows a marked impairment in personal functioning, and this leaves for consideration only cognitive or communicative function, and concentration, persistence, and pace.

The ALJ effectively found that Plaintiff is not *markedly* limited in her cognitive or communicative function, and concentration, persistence, and pace. As noted earlier, "marked" means "interfere[s] seriously with the ability to function." Listing 112.00. Plaintiff was repeatedly able to get herself back on task, to communicate

effectively with her teacher, her classmates, and her school counselor, to concentrate on her work, to persist in her work, and to keep up her pace and finish in the time allotted. She made good grades and scored well on the FCAT. Thus, since only one criterion from 112.02B has been shown (a "marked impairment in age-appropriate social functioning"), the ALJ did not err in finding that Plaintiff's limitations did not meet Listing 112.08.

This likewise disposes of the contention that the ALJ erred by not finding that Plaintiff's impairments equal a Listed impairment. "For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." Sullivan v. Zebley, 493 U.S. at 530, 110 S.Ct. at 891 (emphasis by the Court). Plaintiff has shown that her impairment is marked in only one of the domains set forth in 20 C.F.R. § 416.926a(b)(1)(i) – (vi), interacting and relating with others. A marked impairment in two or more domains is necessary for there to be a finding of equivalency.

The contention that the ALJ failed to give substantial weight to the opinion of Dr. Sadat-Mansouri is unpersuasive. Although Dr. Sadat-Mansouri said that Plaintiff met Listing 112.02, Organic Mental Disorders, he cited no medical evidence of any organic damage that might cause brain dysfunction. The opinion of a treating physician need not be given substantial weight if it is conclusory and is not supported by medical evidence. Phillips v. Barnhart, 357 F.3d 1232, 1240-1241(11th Cir. 2004); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991).

Case No. 4:08cv392-RH/WCS

Finally, the Plaintiff argues that the ALJ did not properly evaluate the testimony of Plaintiff's mother. Doc. 16, pp. 30-31. The ALJ said that her mother overstated the problems, and had "some financial incentive to testify in a manner that shows the child in the worse light." R. 28. The finding that Plaintiff's mother overstated the problems is supported by substantial evidence in the record. When asked by the school counselor how Plaintiff was doing at home, Plaintiff's mother consistently said she was doing better at home than at school. Plaintiff was doing quite well at school on a number of occasions. Further, Plaintiff's mother was not present during the school sessions, and had no basis upon which to formulate an opinion as to Plaintiff's difficulties and successes at school. Dr. Oseroff found that Plaintiff's mother exaggerated her daughter's problems. This was a sufficient basis for the ALJ's determination that Plaintiff's mother overstated the problems, and the court need not address the issue of the mother's financial incentive.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and were based upon substantial evidence in the record. The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to

deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on August 26, 2009.


s/     William C. Sherrill, Jr.
WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE


### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:08cv392-RH/WCS